**In re GEIGER ENTERPRISES, INC., Debtor.**

**Maryann MILLER as Trustee of the Schectman Childrens Trust, Plaintiff,**

v.

**GEIGER ENTERPRISES, INC., William Wehr as Receiver, Defendants.**

**Bankruptcy No. 79–02383 M.**

**AP–280 M.**

United States Bankruptcy Court, W. D. New York.

Aug. 25, 1980.

Code Cong. & Admin.News 1978, pp. 5787, 6320 (1977)).

Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, N. Y. (Robert M. Spaulding, Buffalo, N. Y., of counsel), for Amoco Oil Co.

Donald P. Sheldon, Buffalo, N. Y., for Official Creditors' Committee of Geiger Enterprises, Inc.

Aaron, Dautch, Sternberg & Lawson, Buffalo, N. Y. (William E. Lawson, Buffalo, N. Y., of counsel), for William H. Wehr, Jr., Receiver.

Brick, Brick & Elmer, P. C., North Tonawanda, N. Y. (Daniel E. Brick, North Tonawanda, N. Y., of counsel), for Harold J. Geiger.

Mark S. Wallach, Penney, Maier, Mandel & Wallach, Buffalo, N. Y., pro se.

Arnold M. Quittner, Gendel, Raskoff, Shapiro & Quittner, Los Angeles, Cal., pro se.

BERYL E. McGUIRE, Bankruptcy Judge.

> *During the course of his representation of a client a lawyer shall not . . . [c]ommunicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party . . . .*[1]

1. ABA Code of Professional Responsibility, Disciplinary Rule 7–104(A)(1); New York State Code of Professional Responsibility, Disciplinary Rule 7–104(A)(1). Cases in which the

Harold J. Geiger is the president and sole shareholder of the debtor in the entitled Chapter XI case. He, his wife, and a number of subsidiaries, affiliates, or associated corporations of Harold Geiger also have filed petitions under Chapter 11 of the Bankruptcy Code. His interests in all of the cases and in all adversary proceedings arising within those cases have been and continue to be represented by Mr. Daniel Brick, Esq.

Mr. Harold Schectman is a former owner of River Road Oil Company, Inc., a corporation purchased by the debtor and presently in Chapter 11. He also is a guarantor of an obligation to Central Trust Company, which obligation arose out of transactions relating to the purchase and subsequent sale of a terminal facility used by the debtors on River Road in Tonawanda, New York. Finally, he is the grantor of the Schectman Childrens Trust, an owner of real property which had been sold by Harold Geiger or one of his corporations to Mr. Schectman or the Schectman Childrens Trust and leased back to a Geiger controlled corporation. Though nominally appearing for Maryann Miller, as trustee of the Schectman Childrens Trust, Mark S. Wallach, Esq. and his firm have represented Mr. Schectman's interests in that Trust from the inception of the above captioned adversary proceeding. Arnold M. Quittner (and his firm), although he as yet is not admitted pro hac vice, at the times in question was preparing to join Mr. Wallach in the representation.

## I

On July 23, 1980, after securing the approval of Messrs. Wallach and Quittner, Harold Schectman called Harold Geiger and invited him to lunch on the following day. Around noon on the 24th, Mr. Schectman picked up Mr. Geiger at his River Road terminal in Tonawanda and drove him to Oliver's restaurant which is near downtown Buffalo. Shortly after their arrival at the restaurant, Messrs. Wallach and Quittner appeared and joined them for lunch. That the subject of Mr. Brick's knowledge of the meeting was raised by Mr. Quittner at its outset is agreed to by all participants. [Mr. Geiger's response, however, is very much the subject of dispute.]

Discussions which were the subject of Mr. Brick's representation of Mr. Geiger ensued. Mr. Brick neither consented to nor knew of the meeting.

As to the aforementioned basic facts (except that bracketed), there is no material contradiction between the account of Mr. Geiger and the accounts of Messrs. Schectman, Wallach and Quittner. Thereafter, their respective accounts vary sharply. Although potentially serious and inexcusable professional misconduct is facially evident on this account of events, a further statement of additional disputed areas in the participants' accounts is warranted. To that end, further background, although in part repetitious, will aid an understanding of the gravity of the alleged misconduct.

## A

The petition under Chapter XI in this case was filed in this Court on August 15, 1979. Daniel E. Brick, Esq. was attorney for the debtor and was continued as attorney for the debtor in possession. This corporation was one of a number of corporations used by Harold J. Geiger to handle a large gasoline distribution and retail gasoline sale operation. A very substantial tax liability and actions by the Internal Revenue Service, in large part, may have triggered the filing.

It quickly appeared that the operations of this corporation were far from normal. At various meetings of creditors and hearings, it was claimed that huge sums of cash were involved, and that the business' books and records were either a shambles or nonexistent. It was claimed, in addition, that the delivery of gas to retailers was unme-

Second Circuit Court of Appeals has recognized the appropriateness of considering the ABA standards are legion; see *Armstrong v. McAlpin*, 625 F.2d 433 (2d Cir. 1980); *The NCK Organization Ltd. v. Bregman*, 542 F.2d 128, 129 n.2 (2d Cir. 1976); *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1386 (2d Cir. 1976).

tered, and that a variety of other corporate entities may have been used by the debtor's principal at various points in time. Moreover, it was claimed that large quantities of gas had disappeared allegedly into the Geiger controlled network. Both the Internal Revenue Service and the Creditors' Committee, and more recently the receiver, undertook to address these problems. The debtor's principal, Mr. Geiger, apparently has cooperated to a degree in this undertaking.

To bring the overall operations of Mr. Geiger within creditor and Court control, filings followed by Oilatomic Corp., B–79–14129 M, on October 29, 1979; River Road Oil Co., Inc., B–79–14427 M, on December 17, 1979; Willie the Whale, Inc., B–79–14428 M, on December 17, 1979; Harold J. Geiger and Patricia L. Geiger, B–80–10143 M, on January 23, 1980; Auto Stop Gas, Inc., B–80–10266 M, on February 8, 1980; Queen City Filling & Manufacturing, Inc., B–80–10267 M, on February 8, 1980; Hard Rock Paving Co., Inc., B–80–10268 M, on February 8, 1980; Budget Gas, Inc., B–80–10269 M, on February 8, 1980; The Geiger Trust a/k/a The Geiger Children's Trust, B–80–10673 M, on March 31, 1980 [2]; and Wish–A–Wash, Ltd., B–80–11587 M, on July 1, 1980.

Even a cursory review of the reports on file in this Court will demonstrate the sorry state of affairs of these businesses. They apparently were operated as though they were Mr. Geiger's personal fiefdom without regard to form and, as noted, without proper books and records. To this day, the receiver–trustee, Mr. Wehr, is able to file only consolidated operating reports for Geiger Enterprises, Inc. and the related businesses.

Even the Creditors' Committee in this case is unique. Unsecured creditors as a whole (as is too often the case in this Court's experience) displayed no interest. Amoco Oil Company from the outset of the case, and quite understandably,[3] displayed immediate interest in forming a committee. Ashland Oil Company, perhaps with some reluctance, waived a small portion of its secured indebtedness and joined Amoco on the slate. The only additional creditor willing to join the muster initially was Lawless Container Corp. No other slate was nominated and, without objection, this slate became the Official Creditors' Committee. [On August 12, 1980, at an adjourned meeting of creditors, the Manufacturers and Traders Trust Company [4] and the marine Midland Bank, on application of the Committee and upon vote, were added as members.]

From the outset of the Geiger Enterprises, Inc. case, it was evident that the IRS and the Creditors' Committee, to say the least, were nervous with Mr. Geiger being at the debtor's helm. Several reasons for their concern have been mentioned. In addition, certain aspects of his activities were the subject of an investigation by a federal grand jury (he subsequently was indicted). Moreover, neither he nor his companies could procure credit. On May 14, 1980, Geiger Enterprises, Inc., joined by the Creditors' Committee, moved the District Court, pursuant to Local Rule 1, for the appointment of a receiver. Mr. William H. Wehr,

---

**2.** This case, on motion of Central Trust Company of Rochester, was dismissed on August 20, 1980. This bank holds a mortgage on certain properties with the underlying indebtedness being subject to a guarantee of Harold Schectman.

**3.** Amoco Oil Company, Inc. has pending before this Court a complaint alleging that Geiger Enterprises, Inc. converted approximately 3,500,000 gallons of petroleum products of a value in excess of $1,670,000. [The trial of the complaint has been held generally pending a decision by the Second Circuit Court of Appeals on the appropriateness of Geiger Enterprises,

Inc.'s filing under the new Code (B–80–10265 M, on February 8, 1980). This Court dismissed the above entitled case on February 8, 1980, that decision was reversed by the District Court on March 3, 1980, and it is that decision that is now pending before the Circuit Court. The dischargeability complaint, of course, would be mooted under the provisions of the new Code].

**4.** Counsel for the M & T Bank stated that it had become an unwilling unsecured creditor in a sum which it believed was in excess of $1,000,000.

Jr. was appointed by Chief Judge Curtin, and that appointment was endorsed by this Court. Mr. Wehr, on similar application, was appointed by this Court to act as trustee in all related cases filed under the new Code.

In the context of a number of adversary proceedings involving Geiger Enterprises, Inc. directly or indirectly, the trustee has mounted attacks upon the bona fides of sales and/or financial arrangements with third parties. To date, it appears that Mr. Geiger, through his attorney, Mr. Brick, may be cooperating, at least in part, in these challenges. Motions by the Creditors' Committee and Amoco to join in several of these challenges are pending.

Among the numerous adversary proceedings initiated and pending in this and related cases is the complaint of Maryann Miller as trustee of the Schectman Childrens Trust against the receiver. The complaint was filed in the Geiger Enterprises, Inc. case on May 22, 1980, and it seeks relief from the automatic stay provided by Bankruptcy Rule 11–44 as that stay pertains to certain properties owned by the Trust and being used by the debtor. The trustee's answer raises ten affirmative defenses and two counterclaims. They include claims by the trustee that the transfers (sales to the Trust) were fraudulent as to creditors, were in fact financial arrangements, and are tainted by usury.

**B**

On August 1, 1980, the firm of Gendel, Raskoff, Shapiro & Quittner, by Arnold M. Quittner, filed two motions relating to the conduct of various aspects of the Geiger Enterprises, Inc. case [5] and a third motion seeking certain relief in the adversary proceeding involving the trustee of the Schectman Childrens Trust.[6] All motions nominally were filed on behalf of Maryann Miller as trustee of the Schectman Childrens Trust and were made returnable on August 14, 1980.

Although Mr. Quittner and his firm yet were to be admitted pro hac vice, the papers were filed (based on advice from this

**5.** One motion seeks: "1. ORDER VACATING ORDER APPOINTING CREDITORS' COMMITTEE; 2. ORDER VACATING ORDER AUTHORIZING EMPLOYMENT OF ATTORNEY FOR CREDITORS' COMMITTEE; 3. ORDER VACATING ORDER OF FEBRUARY 26, 1980 AND ORDER OF APRIL 28, 1980, AUTHORIZING PAYMENTS TO ATTORNEY FOR CREDITORS' COMMITTEE; 4. ORDER COMPELLING REPAYMENT OF COMPENSATION AND REIMBURSED EXPENSES AND FOR SANCTIONS AND FOR ATTORNEYS' FEES AND COSTS RE ATTORNEY FOR CREDITORS' COMMITTEE; 5. ORDER VACATING ORDER OF MAY 23, 1980 APPOINTING RECEIVER AND FOR ORDER COMPELLING RECEIVER TO REPAY ALL COMPENSATION AND REIMBURSED EXPENSES AND FOR SANCTIONS, AND FOR ATTORNEYS' FEES AND COSTS; 6. ORDER VACATING ORDER OF APRIL 28, 1980 AUTHORIZING EMPLOYMENT OF ACCOUNTANT; 7. ORDER COMPELLING ACCOUNTANT TO REPAY COMPENSATION AND REIMBURSED EXPENSES AND FOR SANCTIONS, AND FOR ATTORNEYS' FEES AND COSTS." [The request for an order vacating the order of Chief Judge Curtin appointing the receiver since has been withdrawn.]

The second motion seeks: "1. ORDER COMPELLING THE RECEIVER TO BRING A MOTION TO EQUITABLY SUBORDINATE THE CLAIM OF ASHLAND OIL COMPANY; 2. ORDER COMPELLING THE RECEIVER TO BRING A MOTION TO EQUITABLY ESTOP ASHLAND OIL COMPANY FROM FORECLOSING ON THE PROPERTY WHICH SECURES ITS CLAIM; 3. ORDER GRANTING MARY ANN MILLER, TRUSTEE, LEAVE TO PROSECUTE THE AFOREMENTIONED COMPLAINTS IN THE NAME OF THE RECEIVER AND ON BEHALF OF THE ESTATE."

**6.** The motion is captioned "NOTICE OF MOTION AND MOTION OF PLAINTIFF TO DISMISS ITS COMPLAINT WITHOUT PREJUDICE; TO STRIKE AFFIRMATIVE DEFENSES AND TO DISMISS COUNTERCLAIMS OF GEIGER ENTERPRISES, INC.; TO STRIKE AFFIRMATIVE DEFENSES AND DISMISS COUNTERCLAIMS OF RECEIVER, OFFICIAL CREDITORS' COMMITTEE AND AMOCO OIL COMPANY; FOR RECONSIDERATION OF PLAINTIFF'S PRIOR MOTION TO COMPEL RECEIVER TO PAY REAL PROPERTY TAXES AND TO MAKE USE AND OCCUPANCY PAYMENTS; TO COMPEL DEBTOR AND RECEIVER TO PROMPTLY ASSUME OR REJECT EXECUTORY LEASES AND RESPONSE OF PLAINTIFF TO MOTION OF AMOCO OIL COMPANY AND OF THE OFFICIAL CREDITORS' COMMITTEE FOR LEAVE TO INTERVENE."

Court) and, by subsequent agreement of the parties, also were treated as an application to appear pro hac vice [such applications normally are routinely granted, and out of town counsel generally have been granted the courtesy of filing papers pending a convenient time for their appearance and the formal moving of their admission].

Counsel for the respondents to the motions moved for a continuance of the hearing scheduled for the 14th on August 8, 1980; Mr. Wallach represented the petitioner and opposed the continuance. It was at this initial hearing on the continuance that it was agreed the three filed motions also would be treated as an application for admission pro hac vice by Mr. Quittner. Mr. Wallach also was advised by the respondents in chambers prior to the hearing on this continuance that they then believed they were obliged, under the Code of Professional Responsibility, to object to Mr. Quittner's admission pro hac vice and to Mr. Wallach's continued representation of the trustee of the Schectman Childrens Trust.

Since Mr. Quittner was not present, it was decided that the papers opposing his admission and Mr. Wallach's continuation in the adversary proceeding would be filed by 10 a. m., August 13th, and that that matter, as well as the request for a continuance, would be heard on the 14th when Mr. Quittner would be present.

[In connection with this request for a continuance, Mr. Wallach submitted to the Court a letter, dated August 7, 1980, indicating that, while he and Mr. Quittner had no objection to the respondents on the motion being afforded ". . . additional time after August 14, 1980 in which to supply the Court with supplemental memoranda or briefs," they opposed any delay in the argument of the motions. In light of that statement, the Court advised the parties on the 8th that there was little likelihood that argument would be heard on the three motions on the 14th since it would prefer the benefit of the respondents' answering papers before hearing that oral argument.]

Thus, the matter of a continuance was left for argument on the 14th.

The objections to counsel's conduct, required to be filed by the Code of Professional Responsibility,[7] were filed as agreed on August 13, 1980. Upon the filing of the objections, the Court, on its own initiative and pursuant to Bankruptcy Rule 918, directed that the papers be sealed pending further order.

At the hearing on the 14th, and in chambers prior thereto, Mr. Quittner pressed for an immediate hearing on the objections, sought an immediate decision, and advised that he was "totally indifferent" as to whether the papers should continue to be sealed. Mr. Wallach basically agreed, but asked that the papers be made part of the public record. Accordingly, the filed papers as well as the affidavits of Messrs. Quittner, Wallach and Schectman were made part of the public record, and the hearing on the filed objections commenced.

It bears repeating that the two attorneys not only rejected the opportunity to consider and to be heard on the procedure to be employed in the hearing of this matter, but also rejected the opportunity for thoughtful and careful preparation on their part prior to the commencement of this hearing. Instead, they pressed for an immediate, open hearing and an immediate decision by this Court. This Court, though doubting their wisdom, acceded to their first demand, but declined their second invitation.

Consequently, by agreement of all parties, the matter has been submitted upon the affidavits of Messrs. Geiger, Schectman, Wallach and Quittner, as well as the statements of Messrs. Wallach and Quittner made in open court (the latter statements, by stipulation, to be considered as though testified to under oath). [The statements are lengthy and enlarge only slightly on their recall of events leading to the meeting. They will be subsequently addressed. The affidavits are reproduced in full in the appendix to this memorandum and order.]

---

7. ABA Code of Professional Responsibility, Disciplinary Rule 1–103(A).

## II

### The Geiger Affidavits

Mr. Geiger clearly attests to most egregious professional misconduct. Inferentially because of his past cooperation with an appointed officer of this Court, the Official Creditors' Committee and the Government, and again inferentially in an effort to chill further cooperation, he claims to have been intimidated and threatened with financial ruin through use of dilatory tactics by counsel. If true, the sanctions here sought would be too mild. Additional inquiries other than by this Court indeed would be warranted.

In a supplemental affidavit, Mr. Geiger states he was contacted by Mr. Schectman on August 8, 1980, and that Schectman asked that he ". . . not sign an Affidavit which was going to be presented to him by 'them'."

### The Schectman Affidavit

The Schectman affidavit squares with the affidavits and statements of counsel. He states that counsel's message regarding the need for Mr. Brick's presence or consent was conveyed to Mr. Geiger and asserts that on the drive to the meeting he was told by Mr. Geiger that he had talked to Mr. Brick and had obtained his consent to the meeting. He denies discussion of the "Canadian Deals" or of the more devastating aspects of the conversations described in Mr. Geiger's affidavit.

### Counsel's Affidavits

As initially indicated, counsel admit that Mr. Schectman initiated the meeting only after securing their consent to it. They also acknowledge their reliance upon Mr. Schectman to convey to Mr. Geiger the need for Mr. Brick's presence or consent but deny the most damaging aspects of the discussions described by Mr. Geiger in his affidavit.

Mr. Quittner, to support his claim that he believed the meeting was with Mr. Brick's knowledge and consent, points out that he specifically queried Mr. Geiger on the subject [8] and further states that "I do not recall that 'GEIGER' made a verbal response to that question, but indicated with a nod and a smile that the matter had been taken care of." Mr. Wallach, in his affidavit, states that he recalls Mr. Quittner's question to Mr. Geiger on this subject and his recall is that "Mr. Geiger indicated that he knew of the requirement of clearing it with his counsel and shrugged the matter off as being taken care of." Mr. Wallach adds: "As a further assurance he [Geiger] added that 'I am a big boy and can take care of myself'." [The Court hardly regards the latter statement as an assurance.]

### Counsel's Supplementary Statements in Open Court

Mr. Quittner, while seeming to acknowledge poor judgment, largely used the occasion to provide the Court with the benefit of his views on the hostility which out of town counsel confronts, to air his views on the handling or mishandling of the case to date, and near his conclusion, found it fitting to note that it might be necessary to ask the undersigned to recuse himself. Over all, his statement displayed a remarkable lack of appreciation for the gravity of his misconduct and of the charges made by Mr. Geiger [as noted, Mr. Geiger is under indictment by federal authorities (the exact nature of those charges being unknown to this Court)—perhaps this fact, in part, led Mr. Quittner to his treatment of the subject].

Mr. Wallach, on the other hand, displayed a greater degree of contrition. He did suggest that they had been "taken".

As noted, it is conceded that neither Mr. Wallach nor Mr. Quittner contacted Mr. Brick personally to secure his presence or consent. Moreover, the Court finds it highly improbable that prudent counsel could

---

8. This is not to suggest that such a declaration by Mr. Geiger under the circumstances of this case would suffice. See ABA Formal Opinion 108, March 10, 1934. Here, the Court doubts that any prudent lawyer would have believed such a declaration if made.

have believed that Mr. Brick would consent to this meeting in his absence.

Equally difficult to credit is the scenario upon which counsel rely. First, they acknowledge that they permitted their client to initiate the meeting. Second, they state that they relied upon their client to advise Mr. Geiger of the necessity for Mr. Brick's presence or consent. Third, they admit that they relied upon Mr. Geiger to obtain the necessary consent from Mr. Brick. How they expected Mr. Brick to make an informed judgment or to give an informed consent under these circumstances defies understanding.

The charges in this case vividly illustrate the wise underpinnings of the disciplinary rule and the need for scrupulous adherence to its mandates. Violations of its mandates frequently, as here, may lead to the ugliest of swearing contests. In that event, the victim of the violation is matched against an offender who at least in part may seek to rely upon his or her professional integrity to prevail. Potentially capping this spectacle may be charges of a nature which no person could be expected to admit without suffering the severest of sanctions. This potential, when present, is alone sufficient motive for perjury.

If counsel, having admitted in part their professional misconduct, expect partial absolution through findings by this Court that they did not engage in the more aggravated professional misconduct charged by Mr. Geiger, they must suffer disappointment.

The admitted conduct and the remaining findings and observations of this Court suffice to support the basic sanctions sought. The Court has no sufficient basis for gauging the credibility of either Mr. Geiger or Mr. Schectman. While counsel's disclaimers may be true, even the untutored would recognize them to be untested and self-serving. In the face of extraordinarily serious charges of professional misconduct, the

weight of an unsatisfactory record is not to be borne by the Court; it is instead a burden to be carried by counsel whose actions and decisions resulted in that record.[9]

In concluding, one case cited and relied upon in part by counsel warrants comment; namely, *In re Evans*, 524 F.2d 1004 (5th Cir. 1975). Involved in that matter was an out of town attorney who had sought admission pro hac vice in a criminal case pending before the District Court. He was denied admission on the basis of his conduct and offensive behavior in two earlier criminal cases which had been tried before that Court; the Court finding counsel's behavior to be below the standard of Canon 1 of the then ABA Canons of Professional Ethics. In reversing, the Circuit Court concluded that unless counsel was guilty of unethical behavior justifying disbarment of an attorney admitted generally, the lower Court lacked discretion to deny admission pro hac vice.

In this Court's view, counsel's reliance upon the *Evans* case is misplaced.[10] That Mr. Quittner happens to be an out of town attorney is of no consequence at all in this matter. Only due to this Court's relaxed practice which accommodates out of town counsel was Mr. Quittner not admitted pro hac vice when this infraction occurred.

The question here is not one of this Court's standards for admission pro hac vice, but is one of this Court's authority to impose sanctions for what it believes to be a knowing and willful violation of this disciplinary rule. That violation occurred during the course of the attorney's representation of a client in a case and proceeding pending before this Court. Moreover, this matter does not involve a Canon admonishing an attorney to be respectful to the Court, it involves a fundamental disciplinary rule and involves allegations of such potential seriousness as might well warrant disbarment proceedings.

9. Cf. *Hull v. Celanese Corporation*, 513 F.2d 568, 572 (2d Cir. 1975); *The NCK Organization Ltd., supra*, 542 F.2d at 134; *Emle Industries, Inc. v. Patentex, Inc.*, 478 F.2d 562, 571 (2d Cir. 1973).

10. As is his reliance upon *Spanos v. Skouras Theatres Corporation*, 364 F.2d 161 (2d Cir. 1966), which dealt with the right of a citizen to engage out of town counsel.

Here the strong preference for permitting a client his or her choice of counsel must yield in light of this willful professional misconduct.[11] It is for that conduct that this Court concludes Mr. Quittner and Mr. Wallach are disqualified from further participation in this case, this adversary proceeding, and the related cases and proceedings involving Mr. Geiger.

So Ordered.

11. For the standards applicable to disqualification, see *Fisher Studio v. Loew's, Inc.*, 232 F.2d 199 (2d Cir. 1956); *Ceramco, Inc. v. Lee Pharmaceuticals*, 510 F.2d 268 (2d Cir. 1975); *Lefrak v. Arabian American Oil Co.*, 527 F.2d 1136 (2d Cir. 1975); *In re W. T. Grant*, 531 F.2d 671 (2d Cir. 1976).