**In the Matter of the Complaint of KO-REA SHIPPING CORP., as Owner of the M/V SWIBON, For Exoneration From or Limitation of Liability.**

**No. A83–477 In Admiralty.**

United States District Court,
D. Alaska.

Sept. 25, 1985.

Ronald L. Bliss, Anchorage, for movant.

David R. Millen, Anchorage, Alaska, Brian D. Starer, New York City, John M. Conway, Donald A. Burr, Allen McGrath, Anchorage, Alaska, for respondents.

VON DER HEYDT, Senior District Judge.

THIS CAUSE comes before the court on Korea Shipping Corporation's motion for disqualification of counsel, order of preclusion, and other sanctions. This is an admiralty action for exoneration from or limitation of liability, growing out of a collision on the Bering Sea between the M/V Swibon and the M/V Pan Nova, two Korean cargo vessels. Only the Swibon, property of Korea Shipping Corporation, survived the collision. In addition to this suit, related actions are pending in this district and in the Southern District of New York.

The occasion for the motion was a pair of meetings on November 9, 1984, in which lead counsel for claimants Pan Korea Shipping Company, Ltd. and Pan Ocean Bulk Carriers, Ltd. ("the Pan Nova claimants")

met with three persons connected with Korea Shipping Corporation ("K.S.C."). K.S.C.'s counsel of record in this action was not informed of these meetings in advance, nor did it consent to or attend them. K.S.C. asks the court to:

1. Disqualify Haight, Gardner, Poor & Havens, counsel for the Pan Nova claimants, from further participation in litigation involving this casualty;

2. Prohibit Haight, Gardner and its clients from using or communicating any information gathered during the meetings;

3. Deem the allegations of Paragraph XI of the Second Amended Complaint to be admitted (thereby precluding the Pan Nova claimants from introducing evidence on the issue of limitation of liability, a central issue in this litigation); and

4. Award certain costs and attorneys' fees to K.S.C.

The court declines to impose these sanctions.

I. Facts

Both parties have submitted affidavits, presenting versions of the events in question that conflict in a number of respects. The affiants are in accord, however, as to the outlines of those events.

In October of 1984, Haight, Gardner was preparing to open a new office in Hong Kong. Howard S. Miller, who has had no connection with this case, was to become the resident partner in that office. Mr. Miller planned a trip around the Far East with his partner, Brian D. Starer, whose prior contacts with the region were more extensive than his own. Mr. Starer is the firm's designated liaison with the Hong Kong office. He is also lead counsel for the Pan Nova claimants in this litigation. While Brian Starer's purpose in making the trip is disputed, it is undisputed that Howard Miller traveled for the purpose of developing contacts with clients and prospective clients in Tokyo, Seoul and Hong Kong.

Shortly before leaving for Tokyo, Mr. Starer dispatched at least eleven identically worded telexes to firms in Tokyo and Seoul, stating that he would like to introduce them to Mr. Miller and discuss Haight, Gardner's plans in the Pacific basin. One such telex was addressed to Y.T. Jeon of K.S. Line, whom Brian Starer had met while conducting depositions related to this litigation. At the time of the depositions, Mr. Jeon had been K.S. Line's Assistant Manager for Law and Insurance. By October of 1984, however, K.S. Line had been fully absorbed into its affiliate, K.S.C., and Y.T. Jeon had resigned. The October telex and subsequent telexes instead reached Min Hyun Youn, K.S.C.'s Manager in charge of its Legal and Insurance Division. Apparently, neither Mr. Youn nor Mr. Jeon is an attorney.

As K.S.C. did not respond to the initial telex, Haight, Gardner dispatched two follow-up telexes prior to Brian Starer's arrival in Seoul. The last of these, signed by a Haight, Gardner associate, contained a heading referencing the Pan Nova litigation. This reference appears to have been inadvertent. Burrick affidavit; Burrick deposition at 24–25. The texts of all three telexes were directed solely to the development of business for the Hong Kong office.

Mr. Starer telephoned K.S.C.'s offices on the morning of November 9, spoke with Mr. Youn's assistant, and arranged a meeting (apparently still believing he would be seeing Y.T. Jeon). At about 11:30 a.m. Messrs. Youn, Starer, and Miller met in Mr. Youn's office. They discussed general topics relating to Asian shipping for 45 minutes to one hour. Significantly, all who were present agree that they did not discuss the Pan Nova litigation during this initial session. Furthermore, it is undisputed that there was no prior arrangement for the meeting to continue over lunch. At the conclusion of this session, Mr. Youn invited the Haight, Gardner lawyers to accompany him to lunch.

The subject of the Pan Nova litigation was first broached at lunch; the parties do not dispute that it was Mr. Youn who raised it. It is agreed that the ensuing discussion touched on settlement, on the expense of the litigation, and on a Korean

administrative decision relating to liability. Messrs. Starer and Miller claim that the discussion was very brief and was not substantive, cut short by Brian Starer's statement that he could not discuss the case without the presence of K.S.C.'s attorneys. Mr. Youn alleges that Mr. Starer held forth on the above subjects for upwards of forty minutes.

Later that afternoon, at Mr. Youn's invitation, Youn and the Haight, Gardner attorneys met with Byoung Kook Min and James M. West of the Korean law firm Min & Sohn. Min & Sohn is K.S.C.'s domestic Korean counsel, and also advises K.S.C. regarding foreign law in this litigation and in other matters. First West affidavit ¶ 2; Second Min affidavit ¶¶ 2–3. Byoung Kook Min is a partner with that firm and is licensed to practice law both in Korea and in New York. James West is employed by Min & Sohn as Resident Foreign Legal Consultant; he is a member of the Texas bar. Both Judge Min and Mr. West "have been frequently involved in consultations between K.S.C. and its American lawyers retained in connection with … [the Swibon/Pan Nova] casualty." First West affidavit ¶ 4. In addition, Judge Min has served as an expert on Korean law in the Anchorage litigation.

The afternoon meeting opened with a discussion of the capabilities of the Hong Kong office. After a time Mr. Youn stated that he had "no objections if the lawyers wished to discuss the pending Swibon litigation among themselves." First Youn affidavit ¶ 9. For about an hour thereafter, those present argued settlement, as well as the merits of a number of issues in dispute in this litigation.

While in Seoul, the Haight, Gardner attorneys also visited the Pan Nova claimants, a meeting devoted both to business development and to this litigation. Finally, they visited Kim & Chang, Korea's largest law firm, solely to promote business for the new office. In accounting for his meetings with the K.S.C. personnel, Mr. Starer divided his billing between a Hong Kong office account and a Pan Nova account, charging the latter for a meeting "re possible settlement."[1]

## II. Propriety of the Min & Sohn Meeting

K.S.C. alleges that the Min & Sohn meeting (1) violated DR 7–104(A)(1) of the Code of Professional Responsibility, in that it constituted communication with an adverse party with neither consent nor presence of its counsel; (2) violated DR 4–101(B), in that Haight, Gardner knowingly received protected attorney-client confidences; and (3) violated Rule 26 of the Federal Rules of Civil Procedure, in that it constituted improper discovery.

■ The court notes at the outset that even if this characterization of the afternoon meeting were correct, it would not follow as a matter of course that Haight, Gardner should be disqualified and its clients defaulted on the limitation issue. *See, e.g., Grahams Service Inc. v. Teamsters Local 975,* 700 F.2d 420, 423 (8th Cir.1982); *W.T. Grant Co. v. Haines,* 531 F.2d 671, 677 (2d Cir.1976). The demanding test for imposing of such draconian sanctions is explored more fully below in connection with the luncheon meeting. With respect to the Min & Sohn meeting, however, undisputed testimony establishes that there was no violation of any ethical or civil rule.

DR 7–104(A)(1), as adopted in both Alaska and New York, prohibits a lawyer from communicating "on the subject of the representation with a party he knows to be represented by a lawyer," unless "he has the prior consent of the lawyer representing such other party or is authorized by law to do so." The Min & Sohn meeting took place in the presence of and with the

---

**1.** Although the four hours billed to this account may imply that Brian Starer considered at least a significant portion of his luncheon meeting to have been devoted to Pan Nova matters, the court has been provided with inadequate data on which to base such an inference or a contrary inference. The court does not resolve the swearing contest between the K.S.C. and Pan Nova affiants regarding the nature of the luncheon discussion.

consent of two attorneys retained by K.S.C. in connection with the Swibon/Pan Nova casualty. Both are admitted to practice in the United States. By the admission of Mr. West, both "have been frequently involved in consultations" relating to the case. Indeed the very conversation at issue, as described by Mr. West, reveals a sophisticated understanding of the dispute on the part of the Min & Sohn attorneys.

Nonetheless, K.S.C. argues that because Min & Sohn is not counsel of record in this litigation, the presence and consent of its attorneys could not legitimate the afternoon meeting. No meeting could be held, in K.S.C.'s view, without the presence or express consent of the attorneys who have entered court appearances on behalf of K.S.C. K.S.C.'s position raises an issue of first impression: whether the phrase "lawyer representing such other party" in DR 7–104(A)(1) encompasses only counsel who have entered an appearance in the litigation that is the subject of the communication—once an appearance has been entered—or whether the required consent may be sought from other attorneys retained by the party in connection with the same dispute.

In the view of this court, the more restrictive reading would do nothing to advance the purpose of the rule. The thrust of DR 7–104 "is to prevent situations in which a represented party may be taken advantage of by adverse counsel." *Wright v. Group Health Hospital*, 103 Wash.2d 192, 691 P.2d 564, 567 (1984). The rule grows out of a recognition that there is often an "imbalance in knowledge and skill" between lawyer and layman. American Bar Foundation, *Annotated Code of Professional Responsibility* 333 (1979); *See also Snufy Enterprises v. Columbia Pictures Industries, Inc.*, 1978–2 Trade Cas. ¶ 62,170, at 75,221 (D.Utah 1978) (concern that lawyer might "hopelessly entangle the adverse party in a web of legal sophistry"); Leubsdorf, *Communicating with Another Lawyer's Client: The Lawyer's Veto and the Client's Interests*, 127 U.Pa.L.Rev. 683, 684 (1979). A related purpose of the rule is to "preserve the proper functioning of the legal profession" by ensuring that in making decisions relating to a dispute a client has the benefit of the advice of the legal expert he has employed to assist him. ABA Committee on Professional Ethics, Formal Opinion No. 108 (1934); *In re McCaffrey*, 275 Or. 23, 549 P.2d 666, 668 (1976).

The Min & Sohn meeting took place in the presence of and with the consent of two attorneys retained by K.S.C. to render advice in this case. Because the lawyers were conversant with the matters discussed, K.S.C. was not placed at a disadvantage. Neither was K.S.C. deprived of expert legal advice. These experienced attorneys were capable of evaluating the circumstances and of terminating the meeting if it did not further K.S.C.'s interests. The rationale for DR 7–104 demands no more.

Conversely, K.S.C.'s proposed interpretation of DR 7–104 would have negative side effects. It could encourage sharp practice by enabling one attorney to entrap another into an ethical violation. Moreover, such an interpretation would needlessly hobble settlement negotiations in disputes involving two or more separate litigations, each handled by different counsel of record. With regard to the Swibon/Pan Nova casualty, for example, K.S.C.'s interpretation would prevent settlement discussions from proceeding without formal approval from both Bradbury, Bliss & Riordan and Healy & Baillie, counsel of record in the parallel New York litigation.

Because the narrow interpretation of DR 7–104 advanced by K.S.C. would impose needless and possibly dangerous restrictions on the practice of attorneys, the court declines to adopt it. It is sufficient that the Min & Sohn meeting took place with consent of attorneys retained by K.S.C. in connection with the dispute that was discussed.

In view of the court's resolution of the DR 7–104 allegation, K.S.C.'s additional

claims of violations of DR 4–101 [2] and the Civil Rules must likewise fail. Assuming that confidential information was imparted during the Min & Sohn meeting,[3] the information was imparted voluntarily during a discussion in which K.S.C. was represented by attorneys. If such a practice were viewed as a violation of DR 4–101 or the discovery rules, counsel could routinely employ a disqualification motion as a tactical maneuver after settlement discussions, since such discussions often involve a candid exchange of the parties' positions and prospective strategies. These rules were never intended to prohibit the kind of attorney-to-attorney exchange that took place in Judge Min's office.

### III. The Luncheon Meeting

The luncheon meeting between the Haight, Gardner lawyers and Min Hyun Youn presents a more complex problem, because no K.S.C. attorney attended or consented to that meeting. Moreover, the parties are in substantial disagreement as to the subject matter and extent of the luncheon discussion. As in the case of the Min & Sohn meeting, K.S.C. alleges violations of Disciplinary Rules 7–104 and 4–101, and of the Federal Rules of Civil Procedure.

For the purposes of this motion the court will assume, without deciding, that Mr. Youn's version of the luncheon meeting is the correct one. In assessing the gravity of the ethical violation made out by the Youn affidavits, however, the court will look to uncontroverted circumstantial evidence of Brian Starer's intent, rather than rely upon K.S.C.'s unsupported allegations regarding intent.

Mr. Starer does not appear to have visited Mr. Youn for the purpose of discussing the Swibon/Pan Nova casualty. Had he had such an intention, he surely would have raised the subject during the initial hour of conversation in Mr. Youn's office, for the parties agree that no arrangement was made to meet further over lunch until Mr. Youn's invitation at the conclusion of the morning session. Instead, it is undisputed that the subject of the casualty first arose at lunch. The meeting with Mr. Youn does not represent a premeditated stratagem to take advantage of a K.S.C. executive.

### A. DR 4–101

■ K.S.C. has made no showing of a violation of DR 4–101 [4] at the luncheon meeting. Neither of Mr. Youn's affidavits describes a single statement of any significance made by Mr. Youn at the luncheon meeting, still less the nature of any item of confidential information he might have revealed. First Youn affidavit ¶ 7; Second Youn affidavit ¶¶ 5–8.

K.S.C. argues that its allegation requires no support because there is a presumption that confidential information is revealed when a party discusses a matter with a lawyer. It is true that such a presumption, rebuttable in certain circumstances, operates to disqualify a lawyer who has previously represented an opposing party in a substantially related matter. *E.g., Trone v. Smith,* 621 F.2d 994, 999 (9th Cir.1980); *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.,* 518 F.2d 751, 754 (2d Cir.1975). The presumption grows out of the particularly great danger that confidences will have been disclosed during a prior representation, as well as out of the

---

**2.** Alaska's DR 4–101 provides, in pertinent part:
(B) Except when permitted under DR 4–101(C) and (D), a lawyer shall not knowingly
...:
(1) reveal a confidence or secret of his client.
The rule is substantially identical in New York. K.S.C. argues that knowing solicitation of lawyer-client confidences violates this rule, relying on a Ninth Circuit opinion that has now been withdrawn. *See American Protection Ins. Co. v. MGM Grand Hotel—Las Vegas, Inc.,* 765 F.2d

925 (9th Cir.1985) (withdrawing opinion and dismissing appeal for lack of jurisdiction).

**3.** The court does not decide whether K.S.C. has made a prima facie showing that confidential information was released at the Min & Sohn meeting.

**4.** *See supra* note 2. The court assumes, without deciding, that K.S.C.'s interpretation of the rule is correct.

concern that professional commitment will be endangered if a lawyer knows that he may later change sides. *Trone v. Smith, supra,* 621 F.2d at 998. Where an attorney has not previously represented an opposing party but has merely communicated with him, the latter concern disappears and the former is less acute. Accordingly, courts faced with such contacts have applied no presumption regarding confidential information; disqualification must be supported by a *showing* of release of confidential information or other prejudice. *See, e.g., Meat Price Investigators Ass'n v. Spencer Foods, Inc.,* 572 F.2d 163, 165 (8th Cir. 1978); *Ceramco, Inc. v. Lee Pharmaceuticals,* 510 F.2d 268, 271 (2d Cir.1975).

Of course, to require K.S.C. to set out in its affidavits the substance of the confidential facts alleged to have been compromised would further disseminate the confidences and undermine the very interest DR 4–101 aims to protect. *Cf. Trone v. Smith, supra,* 621 F.2d at 999. But here the supporting affidavits fail even to establish that Mr. Youn spoke about confidential subjects. This showing falls far short of what would be required to enable the court to infer a violation of DR 4–101, or to infer that K.S.C. had been sufficiently damaged thereby to warrant sanctions.

### B. DR 7–104

■ Assuming Mr. Youn's version of the luncheon events to be correct, the meeting included a forty-minute discussion of the Swibon/Pan Nova casualty. Though there is no showing of release of confidential information, such an ex parte discussion would be a naked violation of DR 7–104. The court finds, however, that the violation described in the Youn affidavits would not justify the sanctions K.S.C. has demanded.

The court turns first to K.S.C.'s demand for disqualification. The standard to be applied to motions for disqualification founded on violations of DR 7–104 has received scant attention in this circuit. The Eighth Circuit, though according district courts substantial discretion in disposing of

such motions, *Grahams Service, supra,* 700 F.2d at 423, has identified three competing interests to be balanced:

1) the client's interest in being represented by counsel of its choice;

2) the opposing party's interest in a trial free from prejudice due to disclosures of confidential information; and

3) the public's interest in the scrupulous administration of justice.

*Meat Price Investigators, supra,* 572 F.2d at 165. The Fifth Circuit likewise requires "a balancing of prejudices to the parties," *Shelton v. Hess,* 599 F.Supp. 905, 909 (S.D. Tex.1984), while the Second has demanded a compelling reason before separating a party from his chosen counsel, *e.g., W.T. Grant Co., supra,* 531 F.2d at 677.

Because of the great prejudice often associated with an enforced change of counsel, courts applying these standards have granted disqualification only when the moving party has demonstrated substantial and irreparable harm growing out of the ethical violation. Thus in *Shelton v. Hess, supra,* disqualification rested on a "high risk" that confidences would be compromised with "irreparable prejudice to [the adversaries'] ability to defend." 599 F.Supp. at 510. Likewise, in an unreported case heavily relied upon by K.S.C., disqualification occurred because the court could not cleanse the litigation of the effects of a 2½-hour ex parte interrogation of a defendant by plaintiff's counsel, during which "specific facts" going "to the heart" of the dispute were revealed. *Zeller v. Bogue Electric Mfg. Corp.,* No. 71 Civ. 5502, Slip Op. at 3, 5 (S.D.N.Y. Mar. 11, 1975).

In the instant case it can hardly be doubted that disqualification would deal a heavy setback to the Pan Nova claimants. Haight, Gardner has actively litigated this action since its inception more than two years ago. Its attorneys have conducted or defended more than sixty-five depositions and issued extensive interrogatories and requests for production. Much of the benefit of such discovery and trial prepara-

tion would inevitably be lost in a transition to new counsel. To counterbalance the major prejudice disqualification would cause to the Pan Nova claimants, K.S.C. must show substantial and irreparable damage to K.S.C. should Haight, Gardner continue its representation.

Given that Mr. Youn divulged no confidential information during lunch, such irreparable harm could only be found in the luncheon meeting's role as a settlement discussion. Undoubtedly it is possible for an ex parte settlement discussion to threaten sufficient harm, tangible or intangible, to counterbalance the prejudice caused by disqualification. This could be so, for example, where an attorney so intimidates or confuses an adversary that there is a substantial risk that in future, properly conducted settlement negotiations the party's judgment will be impaired. But there has been no showing of any such harm here. First, K.S.C. cannot claim that future settlement decisions would be tainted without showing what, if any, authority or influence Mr. Youn would have over a decision to settle. The Youn affidavits demonstrate only that Y.T. Jeon, the man with whom Haight, Gardner sought to meet, probably would have had little authority in this regard. Second, Mr. Youn appears to be a sophisticated businessman. He is familiar with this litigation and, owing to his connection with K.S.C.'s Legal and Insurance Division, he presumably is not an innocent with respect to litigation in general. To quote a Second Circuit decision involving related provisions of DR 7–104, he is "neither a callow youth nor a befuddled widow." *W.T. Grant, supra,* 531 F.2d at 674. Courts faced with violations of DR 7–104 involving improper contact with sophisticated laymen have declined to find the requisite prejudice to support the extreme sanction of disqualification. *E.g., id.* at 674–77; *Snufy Enterprises, supra,* 1978–2 Trade Cas. at 75,221–22.

While K.S.C. has not shown prejudice that would override the Pan Nova claimants' interest in retaining counsel of their choice, its motion to disqualify might nonetheless be well taken if the third factor identified by the Eighth Circuit, "the public's interest in the scrupulous administration of justice," militated strongly in favor of disqualification. *Meat Price Investigators, supra,* 572 F.2d at 165. Such a situation rose in *Kleiner v. First National Bank of Atlanta,* 751 F.2d 1193 (11th Cir. 1985). There the trial court had disqualified an attorney for contacting adverse parties in "arrogan[t]" disregard of an express order of the court. The Court of Appeals upheld the sanction "without regard for future taint affecting the outcome of the proceeding."[5] 751 F.Supp. at 1210.

Here the alleged misconduct, while potentially a matter of concern to the grievance committee of the relevant bar association, is not so egregious as to require the intervention of the court. *See W.T. Grant, supra,* 531 F.2d at 677. As noted previously, uncontroverted circumstantial evidence indicates that the violation, if it occurred, was not planned in advance as a means of taking advantage of K.S.C.[6] Moreover, Mr. Starer did not interrogate Mr. Youn; nor does it appear that he attempted to dupe him. At most, Brian Starer succumbed to a temptation to advocate his own views on settlement directly to a K.S.C. executive who was familiar with the case. While improper, such conduct is not in the same class as the conduct in *Kleiner,* where counsel's "retention would have eroded public trust in the judiciary." 751

---

5. Even under the extreme facts of *Kleiner,* however, the trial court disqualified only the individual attorney responsible for the violation, leaving his firm in possession of the case. Moreover, in that case the client's interest in having counsel of its choice was entitled to relatively little deference because the client had participated in the violation.

6. Because the alleged improper exchange appears to have occurred spontaneously during an otherwise proper meeting, this case is distinguishable from *In re Geiger Enterprises, Inc.,* 5 B.R. 694 (Bankr.W.D.N.Y.1980).

F.2d at 1210. Accordingly, the court declines to disqualify Mr. Starer or his firm.

K.S.C.'s request that this court default the Pan Nova claimants on a central issue in this litigation is likewise unsupportable. Addressing a similar request for sanctions for a violation of DR 7–104, the Second Circuit in *W.T. Grant* observed:

> We can find no precedent for dismissal of the complaint.... The sins of counsel should not be visited upon his client so as to vitiate the latter's cause of action.

531 F.2d at 676–77. In the absence of a showing of prejudice to K.S.C. growing out of the alleged violation, the court declines to impose a crippling sanction on the Pan Nova claimants.

The court also elects not to impose the other sanctions K.S.C. has requested. The proposed orders relating to confidentiality are inappropriate because, *inter alia,* there has been no showing of release of confidential information. In addition, K.S.C. has requested that the court award costs and fees to enable Anchorage counsel to consult in person with Messrs. Youn, Min, and West. K.S.C. has not shown that such a meeting is required.

Accordingly, IT IS ORDERED:

(1) THAT the Pan Nova claimants' requests for oral argument and for an evidentiary hearing are DENIED pursuant to Local Rule 5(C)(1);

(2) THAT Korea Shipping Corporation's motion for disqualification of counsel, order or preclusion, and other sanctions is DENIED.